```
               IN THE UNITED STATES DISTRICT COURT FOR THE
                       EASTERN DISTRICT OF VIRGINIA

                            Alexandria Division


ISLAM E. SALMAN,                   )
                                   )
     Plaintiff,                    )
                                   )
                                   )
         v.                        )  Case No. 1:16cv1033 (JCC/IDD)
                                   )
                                   )
SAUDI ARABIAN CULTURAL             )
MISSION,                           )
                                   )
     Defendant.                    )
```

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Saudi Arabian Cultural Mission (SACM)'s Motion to Dismiss [Dkt. 18]. Defendant claims that this Court lacks jurisdiction over Plaintiff Islam E. Salman's claims under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*. The Court agrees. Accordingly, the Court will grant Defendant's Motion and dismiss this case.

**I. Background**

Defendant is "an organization created by the Saudi government in 1951 to administer programs and policies to meet the educational and cultural needs of Saudis studying in the United States." Compl. [Dkt. 1] ¶ 9. "[T]he Cultural Mission's primary function is to provide an educational experience to

Saudi Arabian citizen-students studying in the United States that mirrors those services provided by the Kingdom of Saudi Arabia to its citizens enrolled in universities within the Kingdom, including paying tuition, room/board, and health insurance and offering guidance and counseling in course selection."  Mem. in Supp. of Mot. to Dismiss [Dkt. 22] at 6.

In July of 2013, Defendant hired Plaintiff, a U.S. citizen, to serve as an academic advisor.  Both the offer of employment Plaintiff received and the Personnel Guidelines provided with that letter made numerous references to United States employment laws.  Plaintiff's duties included disbursing financial aid to Saudi Arabian students in the United States, evaluating students' continued eligibility for funding, and visiting colleges and universities to "improv[e] business processes and confirm[ ] rules regarding scholarship eligibility."  Pl. Decl. [Dkt. 21-1] ¶ 8.  Plaintiff also "assess[ed] students' needs, goals, interests, and prior academic experiences in order to guide students in the design and implementation of a successful academic plan."  Compl. [Dkt. 1] ¶ 12.

Plaintiff alleges that at some point during his employment, his coworker – Ms. Luma Hawamdah – began sexually harassing him.  She allegedly made unwelcome advances, touching Plaintiff inappropriately and requesting sexual favors.  When

Plaintiff rejected her overtures, Ms. Hawamdah became hostile and verbally abusive. Plaintiff moved to a different office in an effort to avoid her, but the harassment continued.

On May 15, 2015, Plaintiff sent a letter to his superior, Dr. Mohammed Saleh Amaifi, detailing the alleged harassment in accordance with Section 1.5 of SACM's Personnel Guidelines. This led to a meeting on May 29, 2015, at which Plaintiff presented his grievance to SACM's administration. Rather than addressing the harassment, however, SACM allegedly informed Plaintiff that he would be required to sign a letter stating that the matter had been resolved. SACM further threatened Plaintiff with termination should he pursue the matter further. Under duress, Plaintiff provided SACM with a letter stating that his personal issues with Ms. Hawamdah had been resolved.

On June 4, 2015, Plaintiff received a letter from a superior chastising him for wasting SACM's time with his complaint and stating that Plaintiff would face consequences if he raised the issue again. Four days later, Plaintiff replied with his own letter reiterating his claims of harassment and asking the reopen the matter. Within hours, security arrived at Plaintiff's office, instructed him to clear out his work space, and proceeded to escort Plaintiff out of the building. The following week, Plaintiff had a meeting with SACM at which he

received a final warning to drop the matter. Plaintiff chose instead to retain counsel and pursue his harassment claim. Defendant terminated his employment on June 16, 2015, refusing to provide Plaintiff with materials that would have enabled him to obtain unemployment benefits.

On November 3, 2015, Plaintiff filed a claim of discrimination with the EEOC. The agency issued Plaintiff a Notice of Right to Sue Letter on May 17, 2016, and Plaintiff filed the instant action on August 12, 2016. On December 2, 2016, Defendant moved to dismiss Plaintiff's Complaint, claiming that the Court lacks subject matter jurisdiction under the FSIA.

## II. Legal Standard

A motion filed pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction over the pending action. The burden of proving subject matter jurisdiction falls on the plaintiff. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Where, as here, "a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction . . . the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). If "'the

motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial.'" *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) (quoting *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027-28 (D.C. Cir.1997)).

### III. Analysis

"The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 397 (4th Cir. 2004). It holds that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" subject to certain enumerated exceptions. 28 U.S.C. § 1604; *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.").

Plaintiff concedes that, as a diplomatic and cultural mission of Saudi Arabia recognized by the U.S. Department of State, Defendant qualifies as a "foreign state" for purposes of

5

the FSIA. He argues, however, that two exceptions to the FSIA permit this Court jurisdiction over his claims.

Plaintiff cites first to the FSIA's implied waiver exception, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication[.]" 28 U.S.C. § 1605(a)(1). The Fourth Circuit has noted that "[w]aiver under the FSIA is rarely accomplished by implication" and that "courts have consistently held that the implicit waiver provision of § 1605(a)(1) must be construed narrowly." *In re Tamimi*, 176 F.3d 274, 278 (4th Cir. 1999). Waiver may only be implied if the Court finds "strong, unmistakable evidence that" a foreign state "intended to waive its sovereign immunity." *Id*. at 279. Courts have been reluctant to find implied waiver outside of three situations found in the FSIA's legislative history: "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity." *Id.* at 278 (citing H.R. Rep. No. 1487, 94th Cong., 2d Sess. 18).

Plaintiff invokes the second situation, contending that the "Contract Offer" he received from SACM and SACM's

6

Personnel Guidelines demonstrate that Defendant intended Plaintiff's employment contract to be governed by United States law. In particular, Plaintiff points to (1) Section 4.4 of the Personnel Guidelines, which states that "the Cultural Mission is committed to observing the salary basis of the FLSA," (2) the portion of the "Contract Offer" stating that SACM "prohibits discrimination and harassment on the basis of any classification protected by Federal, State or local law," and (3) Section 1.4 of the Personnel Guidelines, which similarly notes that SACM "prohibit[s] . . . conduct that might be construed as sexual harassment (all as defined and protected by applicable law)."

As an initial matter, it does not appear that SACM's Personnel Guidelines give rise to a binding contract. Section 1.1 states that "[n]othing in the Personnel Guidelines constitutes an expressed [sic] or implied contract of employment or warranty of any compensation or benefits." Such a disclaimer generally prevents an employee handbook from being construed as a contract of employment. *See, e.g.*, *Dodge v. CDW-Gov't, Inc.*, 415 F. App'x 485, 487–88 (4th Cir. 2011). SACM's Personnel Guidelines are therefore an awkward fit for the second implied waiver exception to the FSIA.

Even assuming that both the "Contract Offer" and Personnel Guidelines constitute a contract, neither includes sufficiently "strong, unmistakable evidence" that Defendant

7

"intended to waive its sovereign immunity." *In re Tamimi*, 176 F.3d at 279. Both documents refer to United States law, but neither includes an express choice-of-law provision, as is generally the case when Courts find implied waiver. *See, e.g., Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 80 (4th Cir. 1994); *Ashraf-Hassan v. Embassy of France in the United States*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014). To hold that merely referencing United States law effectuates a waiver of sovereign immunity would greatly expand the narrow exception of implied waiver under the FSIA.[1]

The cases upon which Plaintiff relies fail to support his position. Plaintiff cites to *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1006 (D.C. Cir. 1985), claiming that the court in that case found implied waiver based on a contractual term stating a foreign sovereign agreed to abide by the "terms and conditions . . . of AID Regulation 11." Plaintiff, however, is citing a concurrence; the district court

---

[1] Moreover, both documents may be construed as simply stating that SACM endeavors to *voluntarily* conform its behavior to United States employment law. For example, Section 4.4 of the Personnel Guidelines says that "the Cultural Mission is committed to observing the salary basis of the FLSA." This phrasing implies voluntary compliance with a law that is mandatory for other employers in the United States. Similarly, both documents state only that it is SACM's internal policy to forbid forms of discrimination and harassment prohibited by United States law. This language does not rise to the level of "unmistakable" and "unambiguous" evidence that Defendant intended to subject itself to the jurisdiction of this Court. *In re Tamimi*, 176 F.3d at 278-79.

8

rejected that argument, and the panel majority declined to reach the question. *See id.* at 1002 n.3. Moreover, while the court in *Ashraf-Hassan v. Embassy of France in the United States*, 40 F. Supp. 3d 94, 97 (D.D.C. 2014), found an implied waiver, it did so on the basis of a contractual provision that expressly "stipulated that [the contract] was to be governed by local law." As discussed above, Plaintiff directs the Court's attention to no such choice-of-law provision in the "Contract Offer" or Personnel Guidelines.

Waiver under the FSIA is not lightly implied. Because the "Contract Offer" and Personnel Guidelines Plaintiff cites do not unambiguously demonstrate that SACM intended to waive its immunity with respect to Plaintiff's employment, the Court finds that the implied waiver exception does not apply here.

Plaintiff argues in the alternative that this case falls within the commercial activity exception to the FSIA. That exception holds that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state[.]" 28 U.S.C. § 1605(a)(2). The FSIA specifies that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to

9

its purpose." *Id*. § 1603(d).[2] "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

Plaintiff was tasked with, among other things, disbursing financial aid to Saudi students in the United States, evaluating students' continued eligibility for funding, and providing students with academic guidance. *See* Pl. Decl. [Dkt. 21-1] ¶ 8; Compl. [Dkt. 1] ¶ 12. Plaintiff contends that because these services are regularly provided by private universities, this case falls within the commercial activity exception to the FSIA. When evaluating the FSIA's commercial activity exception, however, the question is not whether an individual employed by a foreign state performed job functions with an analogue in the private sector. Rather, the inquiry

---

[2] As the Fifth Circuit has observed, a strict separation of "nature" and "purpose" is impossible in some cases. *See De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1393 (5th Cir.1985) ("[W]e do not believe that an absolute separation is always possible between the ontology and the teleology of an act. Often, the essence of an act is defined by its purpose – gift-giving, for example."). The Court notes as well that "[t]he House Report on the bill that became the FSIA explicitly asserts the congressional intention to leave to the 'courts . . . a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA].'" *Kato v. Ishihara*, 360 F.3d 106, 110 (2d Cir. 2004) (quoting H.R.Rep. No. 94-1487, at 16 (1976)).

centers on the nature of the conduct undertaken by the foreign state itself and the individual's role in that activity.

Take, for example, *Butters v. Vance International, Inc.*, 225 F.3d 462 (4th Cir. 2000). In *Butters*, a private security contractor tasked with protecting the Saudi royal family was, at the direction of the Saudi government, denied a promotion due to her gender. *See id*. at 464. She sued her employer, a private security firm, which was found to enjoy derivative immunity under the FSIA for decisions made by its foreign sovereign client. *See id*. at 466. The plaintiff contended that the commercial activity exception applied because she and the security firm "provided personal and residential protection services" to the Saudi royal family "just as they might to any other client." Brief of Appellant, *Butters v. Vance International, Inc.*, 225 F.3d 462 (4th Cir. 2000), 1999 WL 33636312, at * 26. The Fourth Circuit rejected this argument, focusing instead on the activity undertaken by the foreign state in employing the security firm. Finding the relevant activity to be the foreign state's efforts to "secure the safety of its leaders," the Court deemed the activity in question "quintessentially an act 'peculiar to sovereigns.'" *Butters*, 225 F.3d at 465 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993)). Accordingly, the Court found that the case did not fall within the commercial activity exception to the FSIA. *See*

11

*id; see also Crum v. Kingdom of Saudi Arabia*, No. CIV.A. 05-275, 2005 WL 3752271, at *4 (E.D. Va. July 13, 2005) ("An embassy's decision to hire a limousine driver to transport embassy officials, their families and guests, and meet its everyday needs does not" fall within the commercial activity exception to the FSIA.).

Similarly, the plaintiff in *Kato v. Ishihara*, 360 F.3d 106, 109 (2d Cir. 2004), was employed by Tokyo's government and tasked with "promotional activities on behalf of Japanese companies, such as manning booths at trade shows to promote specific products," and "creat[ing] marketing reports of interest to Japanese companies." Alleging that she had been sexually harassed, the plaintiff filed suit against her employer, arguing that her case fell within the commercial activity exception to the FSIA. *See id*. at 109. The Second Circuit held otherwise, finding that the "superficial[ ] similar[ity]" of her job to that of a private marketing professional was belied by the fact that her work consisted of promoting Japanese business interests *generally*. *See id*. at 111-12 ("Although a private Japanese business might engage in these activities on its own behalf – for example, by sending its representatives to trade shows in the United States to promote its products – such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of

12

Japanese business interests in general."). Finding that "[t]he promotion abroad of the commerce of domestic firms is a basic – even quintessential – governmental function," the court determined that the commercial activity exception to the FSIA did not apply. *Id*. at 112.

Here, it is true that the services Plaintiff performed at SACM bore some superficial similarity to those offered at private institutions in the United States. The difference, however, is that a free college education is a public benefit in Saudi Arabia. *See* Mem. in Supp. of Mot. to Dismiss [Dkt. 22] at 6. Plaintiff was, at bottom, tasked with distributing a public benefit to Saudi students studying in the United States. A foreign state's distribution of public benefits to its citizens is "quintessentially an act 'peculiar to sovereigns,'" *Butters*, 225 F.3d at 465, much like securing the safety of political leaders or promoting domestic commerce.

Saudi Arabia did not buy or sell anything, or engage in any profit-driven activity. *See De Sanchez*, 770 F.2d at 1393 ("[A]s Congress recognized, acts are commercial because they are generally engaged in for profit."). Rather, it simply acted through SACM to effectuate its educational policy, ensuring that students studying abroad received precisely the same benefits as their domestic counterparts. This stands in stark contrast to cases in which courts have found the commercial exception to

13

apply.  For example, in *Globe Nuclear Services and Supply (GNSS), Ltd. v. AO Techsnabexport*, 376 F.3d 282, 289 (4th Cir. 2004), the Fourth Circuit found the exception to apply to a foreign state's purchase of uranium, as "entrance into a contract to supply a private party with uranium hexafluoride is the very type of action by which private parties engage in 'trade and traffic or commerce.'"  Similarly, in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 615-16 (1992), the Supreme Court deemed Argentina's issuance of bonds called "Bonods" to fall within the exception as "there [was] nothing about the issuance of the[ ] Bonods (except perhaps its purpose) that [was] not analogous to a private commercial transaction."  These cases involved clear participation in a commercial activity by a foreign state in a manner comparable a private actor.  There is no similarly clear commercial element to SACM's activities.

    Finally, the Court notes that in *Butters*, the Fourth Circuit "decline[d] to require the Saudi government to justify . . . the arrangements it believes are best suited to ensure the safety of its royal family," as such decisions may "have political, cultural, and religious components" and "[j]udicial interference with them would have serious foreign policy ramifications for the United States."  225 F.3d at 465.  This is, to an extent, also true of Saudi Arabia's choice of

14

personnel implementing its educational policy.  The manner in which Saudi Arabia facilitates and guides the education of its youth has political, cultural, and religious dimensions.  Judicial interference here risks entangling the Court in matters of foreign policy that are beyond its competence.

In light of the foregoing, the Court finds that the commercial activity exception to the FSIA does not apply to this action.

### IV. Conclusion

As neither the implied waiver nor the commercial activity exception applies to this action, the Court is without jurisdiction to entertain it under the FSIA.  Accordingly, the case must be dismissed.  An appropriate order shall issue.

```
                                         /s/
January 17, 2017                   James C. Cacheris
Alexandria, Virginia       UNITED STATES DISTRICT COURT JUDGE
```